Mark L. Eisenhut, State Bar No. 185039
  meisenhut@calljensen.com
Samuel G. Brooks, State Bar No. 272107
  sbrooks@calljensen.com
CALL & JENSEN
A Professional Corporation
610 Newport Center Drive, Suite 700
Newport Beach, CA  92660
Tel:   (949) 717-3000
Fax:   (949) 717-3100

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEWPORT EXCHANGE HOLDINGS, INC., a California corporation; and EYAL SHAHAR (also spelled "Shachar"), an individual and officer of OTA Franchise Corporation and Newport Exchange Holdings, Inc.<br><br>           Plaintiffs,<br><br>      vs.<br><br>AXIS INSURANCE COMPANY,<br><br>           Defendant. | Case No.   8:21-cv-1167<br><br>**COMPLAINT FOR DAMAGES**<br>  1.  Breach of Written Insurance Contract<br>  2.  Breach of Duty of Good Faith and Fair Dealing (Bad Faith)<br><br>**JURY TRIAL DEMANDED**<br><br><br>Complaint Filed:   None Set<br>Trial Date:          None Set |

CALL & JENSEN

- 1 -

COMPLAINT FOR DAMAGES

Plaintiffs Newport Exchange Holdings, Inc., a California corporation, on behalf of itself and its insured subsidiaries, and EYAL SHAHAR (also spelled "Shachar"), an individual and officer of Newport Exchange Holdings, Inc. ("Plaintiffs"), by and through their counsel, hereby complain against Defendant AXIS Insurance Company, a Georgia insurance company, and alleges as follows:

## NATURE OF THE CASE

1.      Defendant Axis failed to provide a defense (or indemnity) to its insureds when such defense was clearly required by the insurance policy.  The insureds initially tendered the matter and requested a defense after receiving a notice from a government agency that they were being investigated for two possible civil claims, potential violations of the FTC Act and the Telemarketing Sales Rule.  Axis wrongly denied coverage because potential claims arising under the Telemarketing Sales Rule are purportedly excluded.  It said nothing about the potential FTC Act claims (which are covered), even though it owed a full defense if any of the claims under investigation were covered.  Later, the FTC brought action against the Insureds, and it made no claim whatsoever under the Telemarketing Sales Rule.  Rather, it made claims under the FTC Act and the Consumer Review Fairness Act (CRFA).  This time, Axis again denied coverage, contending that claims arising under the FTC Act are purportedly excluded.  Axis wholly ignored the CRFA claim, which is clearly covered. Axis owed its Insureds a full defense based on both the FTC Act and CRFA claims, and refused to provide one in bad faith.

## THE PARTIES

2.      Plaintiff Newport Exchange Holdings, Inc. is a California corporation whose principal place of business is located at 17780 Fitch Avenue, Irvine, CA 92614.  Its subsidiaries include OTA Franchise Corporation, and NEH Services, Inc.

3.      Plaintiff Eyal Shahar (also spelled "Shachar") is an individual and officer of OTA Franchise Corporation and Newport Exchange Holdings, Inc. and resides in California.

4.     Defendant AXIS Insurance Company is a Georgia insurance company with its principal place of business in Alpharetta, Georgia.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. §1332(a) because there is complete diversity of citizenship and the amount in controversy exclusive of attorneys' fees and cost exceeds Seventy-Five Thousand Dollars.

6.     This Court has personal jurisdiction over Defendant because it is authorized to and routinely issues insurance policies and transacts other business in California and in this district.

7.     Venue is proper in this District pursuant to 28 U.S.C. §§1391(b) as: (a) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District; (b) Defendant regularly conducts business in this District; (c) the unlawful acts of Defendant complained of herein have been committed within this District and have had effect in this District; and (d) the written agreement/contract as identified and described more thoroughly below was entered into by the respective parties in this District.

## FACTS

8.     Newport Exchange Holdings, Inc. is the Named Insured for Axis policy number MLN624205/01/2018, effective from July 7, 2018 to July 7, 2019 (2018 Policy), and a consecutive policy number P-001-000131866-01, effective from July 7, 2019 to July 7, 2020 (2019 Policy) (together "The Policies"). The Policies provide coverage for Newport and its subsidiaries, including OTA Franchise Corporation and NEH Services, Inc. They also include coverage for liabilities of officers, directors, and employees, including Eyal Shahar, Sam Seiden, and Darren Kimoto.

9.     On or about February 22, 2019, the Federal Trade Commission (FTC) confirmed in writing that it was investigating Newport, its subsidiaries, and Mr. Shahar

"for potential violations of the FTC Act and the Telemarketing Sales Rule." The FTC did not indicate what conduct or circumstances it was investigating as potential violations.

10. Plaintiffs tendered to Axis, requesting defense and indemnity.

11. The 2018 Policy provides coverage, among others, for "Directors and Officers Liability," "Insured Entity Indemnification," and "Insured Entity Liability." Further references herein are to the 2018 policy, unless stated otherwise.

12. The Policy requires Axis to "pay Loss" arising from a "Claim" for a "Wrongful Act." Newport and its subsidiaries are Insured Entities. Shahar, Seiden, and Kimoto are Insured Individuals.

13. A Claim includes "a written notice of investigation or target letter by any Government authority" made "against any Insured Individual" whether such investigation is only of an individual, or also of an Insured Entity. Thus, the FTC's February 22, 2019 notice was a Claim.

14. A Wrongful Act for purposes of the applicable coverages includes "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by (1) an Insured Individual in his or her capacity as such . . . ; or (2) the Insured Entity, with respect to the Insured Entity Liability Coverage." Thus, the FTC was investigating alleged Wrongful Acts.

15. On or about April 3, 2019, Axis denied coverage, and declined to provide a defense. Axis acknowledged the FTC was investigating its insureds for "potential violations of the FTC Act and the Telemarketing Sales Rule," acknowledged the insureds had tendered a "Claim," and implicitly agreed the investigation was of Wrongful Acts. However, Axis quoted an exclusion in the Policy (which it labeled the "Consumer Protection Law" exclusion) which purportedly excludes any Claims arising under the Telemarketing Sales Rule, and on that analysis alone, declared "AXIS disclaims coverage, and will neither defend nor indemnify the Insureds with regard to this Claim," even as to the FTC Act investigation.

16.     After interacting with the FTC for several more months, and fully cooperating with the FTC to provide all information requested, the Insureds again asked Axis to provide the benefits of the Policies they had purchased to protect them: "We respectfully request that AXIS reconsider this denial." The Insureds pointed out "AXIS's analysis in the April 3, 2019 letter only discusses the applicability of an exclusion to the Telemarketing Sales Rule," and failed to analyze coverage for the FTC Act investigation. The Insureds pointed out that the investigation of FTC Act violations was broad, and explained in several pages of detail why the Claims being investigated were covered.  The Insureds even pointed out that the FTC's investigation seemed to also include investigations related to "consumer complaints."

17.     Axis completely ignored the request for reconsideration.  In bad faith, it simply did not respond.

18.     On or about February 12, 2020, the FTC filed claims against Plaintiffs, and sought an immediate TRO to freeze OTA's assets, which would leave it unable to fund a defense of the case if Axis did not fund the defense as required by the Policies.  The FTC's filings consisted of more than 8,000 pages of allegations and purported evidence, with an *ex parte* request that required the Insureds to respond immediately (despite the large volumes of material to respond to).

19.     The FTC did not allege any claims arising under the Telemarketing Sales Rule.  Rather, it alleged claims under the FTC Act and the CRFA – a statute intended to protect a consumer's right to review and/or complain about businesses on social media and elsewhere publicly.

20.     On February 13, 2020, the Insureds, through counsel, provided Axis with a copy of the FTC complaint, pointed out that it alleged violations of both the FTC Act and the CRFA, and informed Axis of the FTC's "ex parte motion for a temporary restraining order."  The letter also further explained that the alleged claims are covered.

21.     Axis did not respond to this new submission for many months, despite knowing the Court was being asked to take immediate action.

22.     Over the Insureds' oppositions, the District Court in the FTC matter issued an order largely freezing the Insureds' assets, leaving them wondering how to fund a defense of the case without the help of the insurance they purchased for this very purpose.

23.     Ultimately, many thousands of student customers of the Insureds came forward in full support of the Insureds. They signed declarations and a petition attesting to the enormous value the Insureds' education provided to them, and that they were never misled in any way. They even moved to intervene into the District Court case and filed an amicus brief with the 9th Circuit. Thus, while the FTC believed the Insureds had misled customers, and had complaints from some disgruntled ones claiming to have been misled, the thousands of students who strongly supported the Insureds were far more numerous and passionate about their positive experiences.

24.     The Court issued an asset freeze because it concluded the FTC ultimately had the authority and potential to recover hundreds of millions of dollars from the Insureds. The FTC Act did not provide such authority to the FTC. However, the 9th Circuit had concluded that the FTC did have such authority, and the District Court was bound by the then-current 9th Circuit law. The 7th Circuit had ruled consistently with the Insureds' position, that the FTC had no such authority. As the Insureds' case with the FTC was proceeding, legal scholars increasingly opined that the United States Supreme Court would likely take a case that would resolve this issue.

25.     More than 8 full months after the Insureds tendered the FTC complaint to Axis, on October 6, 2020 Axis finally responded. The response is dated June 20, 2020, which still would have been more than 4 months after the complaint was tendered, but the Insured's counsel did not receive such letter until October 6, 2020. Axis's delayed response (whether it was 4 months or 8 months) demonstrated bad faith, and the substance (or lack thereof) of their response also demonstrated bad faith.

26.     Axis again denied coverage. This time, it tried to cover its prior bad conduct by claiming that it had properly denied coverage in its April 3, 2019 letter both as to the Telemarketing Sales Rule *and* as to the FTC Act, even though its denial letter never

analyzed the FTC Act issues at all. Axis's new analysis leading it to deny coverage of the FTC Act claims was and is wrong.

27.     Further, Axis did not even attempt to analyze coverage for the FTC's CRFA claim.   There is no conceivable basis for Axis to deny coverage based on such claim. Axis's choice to simply ignore this basis for coverage further demonstrates its bad faith.

28.     Axis also purported to deny coverage based on the definition of "Loss."  It wrote, "the relief sought by the FTC Complaint does not constitute insurable 'Loss' under the AXIS Policy," and thus "the definition of 'Loss' separately and independently bar[s] coverage for the FTC Complaint." But the Policies are abundantly clear to the contrary: "'Loss' means: . . . Defense Costs."  This is a bad faith basis for denying coverage of Defense Costs – which is all the Insureds were requesting at the time, as the case was still active and no settlement or judgment had been reached.

29.     Axis also cited in bad faith the "Illegal Profit or Conduct" exclusion as a basis to deny coverage.  Yet, as to such exclusion, the Policies clearly provide: "the Insurer will provide a defense and pay **Defense Costs** unless or until such conduct is evidenced by a final and non-appealable adjudication adverse to the **Insured** in the underlying action."  No such adjudication ever occurred, and certainly had not occurred at the time of Axis's belated bad faith denial of coverage.

30.     It appears Axis sought at all costs to avoid paying benefits under the Policy, and hoped its Insureds would be financially decimated, leaving them with no ability to pursue claims against Axis under the Policies.

31.     As to the asset freeze order, the Insureds had a strong appeal pending to the 9th Circuit based on the First Amendment, the FTC's lack of authority, and other grounds.

32.     Had they had funding for their defense as required via the Policies, the Insureds could have remained in the FTC lawsuit until their appeal succeeded (as thousands of students hoped they would do), and/or the Supreme Court ruled as to the FTC's lack of authority.

33.     In September 2019 AMG Capital Management began requesting the U.S. Supreme Court to hear a case that would determine whether the FTC had any authority to obtain a judgment for equitable monetary relief in this type of action.  On July 9, 2020, the Supreme Court granted cert and agreed to hear the case.

34.     At the time, the Insureds, their legal team, and many legal scholars, believed the Supreme Court would side with the 7th Circuit, and conclude the FTC had no such authority.

35.     However, the Insureds had incurred millions of dollars in attorneys' fees which they were far delinquent in paying, and did not have the financial ability to continue fighting what they strongly believed to be a just cause.

36.     On or about September 11, 2020, the Insureds entered into a settlement agreement with the FTC, agreeing to pay more than $9 million, and to comply with various non-monetary provisions.  The Court approved the settlement and entered the agreed order finalizing the case.

37.     On April 22, 2021, the Supreme Court issued its ruling, unanimously holding that the FTC has no authority to obtain monetary judgments in the type of proceeding it brought against the Insureds.  Had the Insureds been able to hold out long enough for this ruling, the $9 million settlement would have been zero dollars.

## FIRST CAUSE OF ACTION
### Breach of Insurance Contract Against All Defendants

38.     Plaintiffs incorporate by reference all prior paragraphs, as though set forth in full herein.

39.     The parties entered into binding agreements reflected via the Policies.

40.     Defendants breached the Policies by failing to provide a defense and to indemnify the Insureds.

41.     Plaintiffs suffered damages as a result in excess of one hundred million dollars, and thus well in excess of the policy limits of $4,000,000.00, including unpaid

policy benefits, interest on contract amounts owed, and other out-of-pocket expenses and consequential damages. The exact amount of such damages will be proven at time of trial.

## SECOND CAUSE OF ACTION

### Tortious Bad Faith Denial of Coverage Against All Defendants

42.     Plaintiffs incorporate by reference all prior paragraphs, as though set forth in full herein.

43.     Implied in every insurance policy is an obligation of good faith and fair dealing that neither the insurance company nor the insured will do anything to injure the right of the other party to receive the benefits of the agreement. To fulfill its obligation of good faith and fair dealing, an insurance company must give at least as much consideration to the interests of the insured as it gives its own interests.

44.     Defendants owed Plaintiffs a duty of good faith and fair dealing which included a promise by Defendants to not do anything to injure the rights of Plaintiffs to receive the benefits of the Policies. Defendants' duty of good faith and fair dealing applied to all transactions and relationships between Defendants and Plaintiffs arising under or in connection with the Policies.

45.     Defendants, and each of them, breached the implied covenant of good faith and fair dealing by, among other things, failing to properly and fully investigate Plaintiffs' claims; failing to evaluate Plaintiffs' claims objectively; relying on unreasonable interpretations of the Policies as an excuse for denying policy benefits rightfully owed to Plaintiffs; ignoring portions of Plaintiffs' claims that were clearly covered so as to deny coverage; leaving the Insureds in a vulnerable position to have to incur substantial legal fees and pay a substantial settlement on claims that could have been resolved for zero dollars; not attempting in good faith to effectuate a prompt, fair and equitable resolution of Plaintiffs' claims; failing to advise Plaintiffs of all policy benefits, coverages, and other provisions that might apply to Plaintiffs' claim under the Policies, and as required by 10 Cal. Code of Regs. § 2695.4(a); compelling Plaintiffs to institute litigation and incur legal

costs to recover policy benefits rightfully due under the terms and provisions of the Policies; and deliberately denying policy benefits that Defendants, and each of them, and their representatives knew were owed under the terms and provisions of the Policy, in conscious disregard of Plaintiffs' known rights and established law.

46.     Plaintiffs suffered damages as a result in excess of one hundred million dollars, including but not limited to unpaid policy benefits, settlement amounts that could have been avoided had Defendants acted properly, severe harm to the business and its brand reputation that will stain the company for years (which could have been avoided with financing for a continued defense), and extreme and severe emotional distress for Shahar and other individuals involved.

47.     The conduct of Defendants, and each of them, is part of a long-established pattern of bad faith conduct designed to deprive Plaintiffs and others of policy benefits.

48.     In committing the acts described in this Complaint, Defendant and its employees and/or representatives acted intentionally, with a conscious disregard for the Plaintiffs' known rights, and did so in a fraudulent and oppressive manner. The acts and omissions, described above, warrant the imposition of exemplary damages in an amount sufficient to punish and deter Defendants from engaging in similar conduct in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request relief and judgment against Defendant as follows:

1.     An entry of judgment in favor of Plaintiffs and against Defendants;

2.     For special damages according to proof;

3.     For general damages according to proof;

4.     For an award of punitive and exemplary damages;

5.     For attorney fees;

/ / /

/ / /

1      6.       For costs of suit; and

2      7.       For such other relief as the Court may deem just and proper.

3

Dated:  July 6, 2021               CALL & JENSEN

4                                  A Professional Corporation
                                 Mark L. Eisenhut

5                                  Samuel G. Brooks

6

7                             By: */s/ /Mark L. Eisenhut*
                                  Mark L. Eisenhut

8                           Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **JURY DEMAND**

Plaintiffs demand trial by jury.

Dated: July 6, 2021

CALL & JENSEN
A Professional Corporation
Mark L. Eisenhut
Samuel G. Brooks

By: */s/ Mark L. Eisenhut*
Mark L. Eisenhut

Attorneys for Plaintiffs